The case on today's docket is the case of People v. Krista Donoho, and we have Ms. Paige Straughan for the appellant, and we have Ms. Kelly Stacey, oh he's trying to reverse your name, for the appellee, so I had to look. So you may proceed Ms. Straughan. Okay, please support counsel. I represent Krista Donoho, the first of three defendants in the local murder case involving local Flint, best rated for R. Krista was a young girl involved with an older man with a very complicated criminal history, an intimidating man, Demetrius Cole, not a good boy at all. He had a brother named Christopher Watkins who was kind of his little partner in crime, and Krista was completely in love, completely enamored of this man. Every piece of evidence of trial supported the fact that he controlled her every move. He made her decisions, he told her what to do, and she did it. How old was Krista? Was she a juvenile? No, I'm trying to remember exactly how old she was at this time, maybe 20, 19, 20, 21, pretty young. She was an adult, absolutely. Cole was I think about 8 to 10 years older. But definitely a young girl with a rough background, you know, a troubled history, certainly not a, you know, a fresh flower by any stretch, but certainly no horrible history in her life. But she's in love. She's in love with a man who's not very nice. Sometimes bad things happen when you're involved with a man who's not very nice. In this case, Krista had the misfortune of meeting Mr. Giroir while she was at the liquor store with her boyfriend's mother one afternoon. She didn't seek him out. He sought her out. In fact, he asked the boyfriend's mother, who is that? I'd like to know her. And went to Krista and introduced himself. And that's how they became, that's how they became acquainted. This is the last week of June. They exchanged information. She didn't give him her real name, of course. She, at least they exchanged phone numbers, or she gave him her phone number, and he started to call her. She would meet him occasionally, and he would give her money. They met at a local restaurant and had dinner together. Gwendolyn Jones, the boyfriend's mother, went with her, supervised this, which is interesting because later on she claimed that she warned Krista, don't be involved with this man. You shouldn't do that. This is bad. But she participated in it. She drove her to places to meet with him, and Mr. Giroir would give her money. Now, what went on between them in order to cause him to give her money is a matter of some dispute. There is no dispute that it is true that Mr. Giroir didn't like to pay for sex with young, skinny white women, and Krista was the young, skinny white woman. Whether that is what was going on with them at that stage really was never totally established, but the fact is he would give her money. He was happy to give her money. He would invite her to meet him, and he would give her money. So she would go, and she would get it. This went on for a few days, not for a very long time. I mean, a number of days, probably less than a week. It was not really secret. He would call the house looking for her where she lived with her boyfriend Cole and Gwendolyn Jones, his mother. They would play phone tag. There was a lot of conversation between them. They met at least two times. There's no indication, although it is suggested, but it's not actually backed up by any evidence at trial, that Krista had ever been to Mr. Giroir's house prior to the night that things all blew up. The only issue in this case was whether or not it was proven that she participated in a plan to rob Mr. Giroir, in which she was unfortunately murdered during the robbery. So she is convicted on accountability for a felony murder. There's absolutely no evidence at all that she had any clue that this is what was going to happen or that there was ever an attempt to rob Mr. Giroir. Unfortunately, because of the nasty nature of the offense and certainly the complicated evidence, somehow the jury was ultimately convinced that she was involved. Now, they didn't get their reason. The jury did ask for some clarification on some instructions on intent and knowledge. So there is some suggestion that they certainly did not raise from being instructed, being charged with deliberating and immediately coming back to the verdict. That is not what happened. There was definitely some question, which suggests they struggled themselves about whether she had been actually proven guilty. I want to tell you why there's absolutely no evidence that she participated in a plan to rob Mr. Giroir. First, on the evening that this happened, she was riding around with her boyfriend Cole and Chris Watkins. They pick up some girl on the side of the road, some young girl, 16-year-old Chandra. Nobody knows her, but apparently she's good looking and Watkins wants to talk to her, so they pick her up. And they sit around in the car drinking and talking. Nobody knows this woman or this little girl at all. They decide to take her to a robbery. That doesn't make any sense. You don't pick up a stranger to take to a felony that you have planned to go commit. Nobody does that. You certainly don't take one and then stop at a gas station, the Casey's on Salem Road, and call for directions to the robbery man's house to get directions so you can go rob him. You certainly don't do that from a pay phone that tracks all of your information and has video cameras so that it can be proven that you stopped and called and did all of that. Chris's story all along was that she was going to meet Mr. Giroir so he would give her money because that's what he does is he gives her money. All of the evidence in this case supports that's exactly what went on. And the starting of picking up, Chandra, who testified at trial that Chris just said we're going to go get money from this man. I've done it before. That does not prove an intent to do anything other than to go get money from this man. It doesn't prove an intent to rob him. You don't need to rob him. He gives you money. She didn't know how to get to Mr. Giroir's house. Nobody knew how to get there, which negates the idea that she had been there before and thus would have any knowledge that he evidently kept a lot of cash stacks of $100 bills in his house and where he would have kept that. There's no suggestion anywhere in the record that she would have had any way to know that that's what he did. Now, it's very clear that Mr. Giroir had money. He drove around in fancy cars and he handed it out. And he's a very well-known man. So there was certainly – there's no suggestion that she knew where money was in his house, but of course she knew he had it. Plus, he was willing to give it to her, so, you know, that wasn't much of a secret. The guys, Colton Hopkins, drive out to the house and they drop Chandra and Chris off and they go to the front door and the guys start to drive away. They're just leaving Chandra and Krista there. Now, if they're going to rob him, where are they going? If Krista is in on a plan to rob Mr. Giroir or to have her boyfriend and brother rob him, why would they just rob her off and leave her? When they went to the front door, Mr. Giroir said that Chandra wasn't welcome there. He just wanted Krista. They have to run down the street and wave to Al, Colton Hopkins, to ask them, hey, hey, hey, come back, come back and get us. Chandra goes to the car, Krista goes in, consistent with her purpose of going to see Mr. Giroir to get money, because he gives her money. She's in the house and Chandra is in the car with Colton Hopkins. Chandra testifies that the guys climb out, open windows from the car. They don't open the doors, opening the doors would set off an overhead light, maybe, I'm not sure what that's called. They climb out the windows, they have a little chat, they get back in the car. Our position is that is when the plan to rob Mr. Giroir was developed. Krista's already in the house. There's no indication she had any clue that this little plan was being hatched outside. But that's the most obvious time for it to have come together. Everything leading up to that point supports that there was no plan to rob him until that stage. According to Chandra's testimony, however, she stayed to the bitter end. She did? Krista stayed to the bitter end? Yes. I could explain. And also, I guess the other lady of the evening said that it was Mr. Farrar's habit to always lock the door behind. When he would have the lady friends over. If you believe that, then someone had to open the door to let two gentlemen in. Possibly. There was also evidence that when Mr. Farrar was last seen, before he went home that night, he was relatively into his guts quite well. He'd been hitting it all day at the country club and had a few drinks on the way home and maybe wasn't quite on his game. Maybe she was, as Krista explained to the police and everyone else, she'd gone there to get money and go away. She wasn't going there to have an evening session and maybe spend some time like his other lady friend would do. She was just going there to get money and go away. You don't have to lock the door behind. Who knows? She was also a new person, had never been to his house. You know, we don't know what his habits would have been with Krista. We know that they were with Lisa Bradford. We don't know. So while Krista's in the house, Paul and John have a little chat outside of the car, outside of Chandra's presence. And then they go to the door. And the next thing Chandra claims she knows is she sees them crawling across the living room floor. She can see this through the picture window, toward Krista and Mr. Fry. And that's when things go terribly wrong. They start beating him. They get him down on the ground. They kick him. They apparently kick him and beat him really harshly and pick him up and march him across the window to where Chandra can't see him anymore. Next thing you know, Krista's standing at the front door. A gunshot goes off and she's screaming. That Chandra was consistent on the shot and Krista at the front door happening at the same time. She screams, and then the door is shut again, and there's a second gunshot. Now, why, if they were going there to rob Mr. Fry, did they take no weapon? Why did they take a stranger? Why did they call for directions from the man they were going to rob to get there? It doesn't make any sense. All of us, actually. That was fast. You left the opportunity for rebuttal. Ms. Stacy. Thank you, Your Honor. Counsel, may it please the Court, my name is Kelly Stacy, appearing on behalf of PEOPLE. The defendant agrees that the evidence at the trial established that Randy Farrar was robbed and murdered, but she disputes that she can be held legally accountable. To obtain a conviction for felony murder premised on robbery, the PEOPLE are not required to prove that the defendant intended to kill Randy Farrar or knew that her acts created a strong probability of killing him, but to support a charge of felony murder, the robbery must have an independent felonious purpose. The jury believed the defendant was guilty of robbery because they convicted her of the predicate offense of robbery. They also convicted her of the first-degree murder of Randy Farrar. The trial court vacated the robbery conviction as a lesser-included offense of first-degree murder. There is plenty of evidence in this case to support the jury's verdict. The defendant had an established pattern of meeting Randy Farrar to get money from him. She telephoned him numerous times on the day of the murder and made sure he was home before she and her companions carried out the robbery. She was seen by a witness carrying off and discarding evidence after the robbery and murder, and although there were opportunities for her to abandon the plan to rob Mr. Farrar, she held steadfast, and the jury could reasonably conclude she was legally accountable for the murder predicated on robbery. The defendant tried to get a witness to lie for her to establish an alibi after the fact and confess to another friend that she might have set somebody up and they got killed. The evidence established consciousness of guilt and an admission against interest. In reply, the defendant argues that this may not have even really been an admission, but that is solely a trifle fact to weigh that statement along with all the other evidence presented. The day after the robbery and murder, the defendant, her boyfriend, and his brother went back to Mr. Farrar's house. After that, the defendant and her boyfriend went to St. Louis where they remained for three months. They were apprehended at that time. The fact that the defendant and Demetrius Cole were holed up together in St. Louis to avoid capture belies her claim in reply that she only remained at the scene of the robbery and murder because she was afraid of Cole, not because she was involved in the robbery. The defendant argues in her reply brief the fact that she threw away items taken from Randy Cole's home after the robbery could have just established that she was merely present at the scene. She claimed she would have had these items just because she was at the house when the robbery occurred. The only reason the defendant would have to flee the scene with a glass, a pen, and a knife in her hand and then throw those items away is to cover up her participation in the robbery. The defendant claims that some of the evidence presented could reasonably support her claim that she was as surprised as Randy Farrar was that a robbery was in the courts. The jury believed otherwise. The jury didn't grapple a whole lot with this case. They returned a verdict in four hours. When a defendant challenges the sufficiency of the evidence, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution. In Illinois, for accountability to lie, it is unnecessary to establish active participation in order to impose guilt. Words of agreement are not necessary to establish a common purpose to commit a crime. Common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. Proof that the defendant was present during the commission of the offense, that she maintained a close affiliation with her companions after the commission of the crime, and that she failed to report the crime together with the defendant's flight from the scene are all factors that the trier of fact may consider in determining the defendant's legal accountability. This case is textbook accountability. The evidence presented was more than sufficient for the jury to conclude that the defendant, with the intent to promote or facilitate the robbery of Randy Farrar, aided two others in the commission of the robbery, leading to the first degree murder of Randy Farrar. Because Mr. Farrar died during the commission of the felony, the forcible felony of robbery, facilitated by the defendant, her conviction for first degree murder should be affirmed. I'd like to also address the issue of sentencing brought up by the defendant in Issue 3. The defendant argues that the trial court considered the fact that Mr. Farrar died during the commission of the robbery as a factor in her sentencing. She argues that the state did not distinguish the case she cited in Peeble v. Conover. Conover holds that where a defendant receives compensation for participation in burglary, the fact that he received the compensation cannot be used as an aggravating factor in the sentencing. Peeble v. Beals was a case cited by the state. It is more directly on point, especially where, as pointed out by the defendant, she did not receive any proceeds from the robbery. Both Conover and Beals are Illinois Supreme Court cases. Beals was a first degree murder case like this one. In Beals, like here, the trial court mentioned the death of the victim when it fashioned the sentence. The Beals court held that where a trial court observed that a defendant's conduct causes death, but the record clearly establishes that the court relied on other factors and may be concluded that any weight the court placed on the fact that the defendant's conduct caused the ultimate harm was insignificant and did not result in a greater sentence. Here, the trial court relied on several factors. It relied on her history of criminal activity, her prior crimes of violence against a family member, and obstruction of the police. It mentioned her failure to abide by probation, failure to take advantage of counseling, and the probability that she would be dangerous in the future. The court considered that a severe sentence was necessary to deter others from committing similar crime. The trial court concluded by saying, in a letter that was admitted during trial but not all that was given to the jury, she compares herself in cold as a modern-day buying fly pillow. Her idea of adventure and romance is the criminal life that she chose to lead, the life that she sought. She was not just led astray. In the eyes of this court, the defendant has a cold heart and was searching for money and excitement. This court believes that the defendant is dangerous because these are the type of circumstances that could easily reoccur. And despite her apology, as she sits here ready to be sentenced to the Department of Corrections, this court believes that the evidence at trial shows that the defendant has a character and an attitude that make it likely that she will continue to lead a life of crime. Ms. Donahoe was properly convicted, the trial court properly sentenced her, and the people urge this court to affirm. Thank you very much. Thank you, Ms. Stacey. Do you have rebuttal, Ms. Strachan? Ms. Stacey mentioned that this is a textbook case of accountability. It's not a textbook case of accountability. It's a textbook case of a silly young girl who has been manipulated and controlled by a man she loves and who has gotten herself in over her head and is ultimately paying a 45-year sentence as a result. She talks very much about Krista's conduct after the offense, and I was answering earlier about her failure to withdraw from the situation. She just watched the man she loves violently beat and murder her. The man has a gun. A shot has just gone off. She was at the front door when the shot happened. Maybe she was trying to leave. Then the shot goes off. There's a second shot. She's terrified for her life. Anything she did after that point was under his direction. The fact that she disposes of evidence afterwards is done while she's in the presence of gold. She's never given any proceeds, yet everyone else involved in this case is splashing money around, including Chandra Jones. There's not any suggestion anywhere on the record that Krista was ever given anything from this. That really negates the idea that there was some common design, let alone that she was the instigator of this entire offense. It makes absolutely no sense for her to have killed the Golden Goose or to have done anything to set him up to have killed the Golden Goose. He was giving her money all the time, or at least in the few short days that she had known him. If it was an intent to rob him, wouldn't it have made more sense for him to be robbed when he wasn't at home with her? He certainly could have had his house burglarized if they knew there was money there. Instead, they confirmed he's home before they go to visit. That supports her claim all along that she was going to get money that he's more than happy to give her. In fact, she told everyone she knew that's what they were going to do. She told her boyfriend's mother they were going to go get money from Mr. Broderick. She told Chandra Jones, a person she doesn't know, we're going to go get money from him. Not we're going to go rob him, we're going to go take money, we're going to go do something bad. I'm going to go get money from this guy that gives it to me. All of those things are consistent with her continuing what had happened up until that stage, which was to get herself a sugar daddy who was happy to be there. Nothing anywhere in this record shows that she knew that Cole and Watkins had another goal, and all of the evidence suggests that they made that goal when she was in that house. Way too late for her to know anything about it. Way too late for her to have participated in it. Way too late for her to be legally accountable for what those two men decided to do and drag her down with them in the process. And if you want any more evidence that this woman was blinded by love for this fool, when they were arrested months later, she asked the police officer if she could just kiss him one more time. That's a young girl in love. Crazy in love. And paying for it with the rest of her life. But that's a little girl in love. That is not someone who was using her feminine wilds, what they may have been, to go and kill people or rob people. That's a little girl who was in love with a monster who took advantage of it and used her to get what he wanted and probably didn't even tell her that's what he was doing. And the state didn't prove any evidence anywhere else that showed that she actually participated in a decision to commit this offense. And because of those shortcomings of the state's case, she was asked to reverse her conviction. Thank you, Ms. Strong, Ms. Stacy, for your briefs and arguments. We'll take the matter under advisement.